UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

TEDDY VOLKSWAGEN OF THE BRONX,
LLC,

            Plaintiff,

         v.                   19 CV 2337 (AJN)

PHILLIP DEMERSKY,

         Defendant.        Conference
------------------------------x
                            New York, N.Y.
                            June 7, 2021
                            11:15 a.m.

Before:

               HON. ALISON J. NATHAN,

                            District Judge

                   APPEARANCES

MILMAN LABUDA LAW GROUP, PLLC
    Attorneys for Plaintiff
BY:  EMANUEL KATAEV

RANNI LAW FIRM
    Attorneys for Defendant
BY:  JOSEPH J. RANNI

1           (Case called)

2           MR. KATAEV:  Good morning.  This is Emanuel Kataev of

3    Milman Labuda Law Group, PLLC for the plaintiff, Teddy

4    Volkswagen of the Bronx, LLC.  It is such an honor to be back

5    in person in court, your Honor.

6           THE COURT:  Thank you, Mr. Kataev.  Good morning.

7           We don't have anyone here on behalf of the defendant.

8           Just to provide a brief background of what occurred, I

9    did receive a letter from you, Mr. Kataev, last week raising

10   issues about preparations for trial which is scheduled to

11   commence on June 28.  I candidly was confused by some of the

12   questions, had concerns about the matter being on track for our

13   scheduled trial date.

14           So I put out an order on Friday morning indicating

15   that I wanted to see the parties today so that I could try to

16   understand what the questions were, any outstanding issues,

17   make sure we are on track to proceed.  I put that order out.  I

18   don't have the time that it was docketed, but it was Friday

19   morningish.  About 11:29 a.m.  My clerk tells me.

20           Is that consistent with your memory, Mr. Kataev?

21           MR. KATAEV:  That's exactly correct, your Honor.

22           THE COURT:  That was Friday.  The weekend passed.

23           This morning, at about 9:38 a.m., I received a letter

24   request from defense counsel asking to adjourn today's

25   proceeding because he had a deposition scheduled for today and

1    tomorrow.

2              Given my concern about needing to get the case on

3    track and given the late hour, I presumed you might be on your

4    way, Mr. Kataev.  You later called chambers, before I put out a

5    response to the request, indicating that you were on your way,

6    so I put out an order denying the adjournment request.  You

7    confirmed receipt of that order, which my chambers e-mailed to

8    both counsel to make sure it was expeditiously put in front of

9    counsel.

10             I don't believe we have received a confirmation of

11   receipt from Mr. Ranni, defense counsel.

12             Here we are.  I don't know whether defense counsel

13   received my denial of the adjournment request.  We haven't

14   heard additional word.

15             Have you spoken to defense counsel today, Mr. Kataev?

16             MR. KATAEV:  Your Honor, this morning I received a

17   voice message on my office line, which I received via e-mail

18   from defense counsel that supports that.  Antoinette McGee, we

19   have a very cordial relationship, and we keep in contact.

20             Last week, on Friday, when the order came in, we had

21   exchanged various e-mails about the upcoming trial.  And in

22   exchanging those e-mails Ms. McGee's automatic response

23   indicated that she was out due to a death in the family.  I

24   expressed my condolences and received an e-mail thanking me for

25   that after the voice message.

1        I called back while I was driving to the court and

2   spoke to Ms. McGee.

3        THE COURT:  That's today, you mean.

4        MR. KATAEV:  That's today, this morning.  She

5   indicated to me that Mr. Ranni had depositions and that she

6   would be making an adjournment request.

7        I asked Ms. McGee, since I was driving, to indicate

8   that I was on the way, and I stated to her specifically, given

9   the fact that she had a death in the family, I won't take any

10  position on the request.  She thanked me and she filed the

11  letter.

12       I did review the letter after it was filed and noticed

13  that it stated that I was on the way, past tense.  I wanted to

14  correct the record but was unable to do so in writing because I

15  was behind the wheel.  So instead I contacted the Court by

16  phone and indicated that I still am on the way.  As far as I'm

17  concerned, as far as plaintiff concerned, there is an order to

18  appear in person, and I will be so appearing.

19       I also informed the Court's support staff, I am not

20  sure who I spoke to, that I would be asking the Court to allow

21  the defendant to appear by telephone.  I do have his cell phone

22  number, and I would like to -- I don't know if it's possible,

23  but I would like to ask the Court to order him to pause his

24  deposition in order to conduct this conference because there

25  are numerous issues here that need to be discussed, and I am

1  prepared to discuss those issues.

2          THE COURT:  Why don't I step down for a minute.  I'll

3  ask Ms. Williams to see if she can get Mr. Ranni on the phone,

4  and we will proceed from there.  I am just trying to think if

5  we should do it in the robing room.  Why don't you try to get

6  him on the phone.  I'll step down.  Thank you.

7          (Recess)

8          THE COURT:  This is Judge Nathan.  Do we have Mr.

9  Ranni?

10         MR. RANNI:  Yes, your Honor.

11         THE COURT:  I do need you to speak up, Mr. Ranni.

12 Could you put in your appearance, please.

13         MR. RANNI:  Joseph Ranni, Ranni Law Firm, on behalf of

14 defendant Demersky.

15         THE COURT:  Mr. Kataev is here.

16         I started a few moments ago just running down the

17 history of what led to the in-person conference.  I scheduled

18 for today, which I did schedule on Friday morning.  As I

19 indicated before you joined, the reason I wanted to have an

20 in-person conference, I had received -- we are scheduled to

21 proceed to trial on June 28.  I had received a letter from

22 plaintiff's counsel last week with a series of questions that I

23 didn't fully understand and raised concerns if we are on track

24 for trial to commence on the 28th.  So I put out an order

25 scheduling this conference on Friday morning for today, Monday,

1    at 11 a.m.

2           At 9:38 this morning I received a letter request from

3    you, Mr. Ranni, asking to adjourn the conference.  I denied

4    that request, which is why we are proceeding today.

5           Did you receive my order scheduling this conference

6    last week, Mr. Ranni?

7           MR. RANNI:  I did not, your Honor.  On Friday,

8    Saturday, and Sunday, I was in a multidisciplinary

9    certification program put on by Fordham Law School and

10   University of Rochester that was from 8 a.m. to 6 p.m. every

11   day.  Then today I'm in a federally court-ordered deposition on

12   a very important case, so I did not see your order.  My

13   assistant was out to a death in the family on Thursday and

14   Friday.  My apologies.

15          THE COURT:  Your assistant, I understand, was aware of

16   the conference, according to Mr. Kataev's recounting.

17          MR. RANNI:  She told me this morning.  She didn't know

18   on Friday.  She was at a funeral for her cousin who died a week

19   after her aunt.  So she was in no mental or physical condition

20   last week or this weekend for anything.  Two very close family

21   members passed.

22          THE COURT:  Mr. Ranni, your representation to the

23   Court, as a member of the bar, is that you were not aware of

24   this conference scheduled for today until today, or when

25   specifically did you become aware of it?

1          MR. RANNI:  I learned this morning.

2          THE COURT:  What time?

3          MR. RANNI:  When Antoinette came in the office.

4          THE COURT:  What time?

5          MR. RANNI:  I couldn't say specifically.  I think it

6  was about 9 a.m., quarter of 9, maybe as early as 8:30.

7          THE COURT:  I am going to let it go.  Obviously, if

8  there is a death in the family and you were not made aware of

9  it until today, it's understandable why there was a late

10  request to adjourn.  But, as I said, I denied the request.  So

11  we will proceed by phone now.

12          MR. RANNI:  Thank you, your Honor.

13          THE COURT:  Mr. Ranni, I put out a second order on

14  Friday.  Are you aware of that order?

15          MR. RANNI:  I have not seen any e-mails, your Honor.

16  I really rolled from the program, tried to prepare for this

17  deposition today.  It's really one of my most important cases.

18  I haven't communicated with family in the past four days.  I've

19  really been very consumed and working very long hours.

20          THE COURT:  Are you prepared to commence trial on June

21  28?

22          MR. RANNI:  Your Honor, I will do what the Court

23  directs.

24          THE COURT:  Mr. Kataev, what is your position as to

25  whether the parties are going to be prepared to commence trial

1   on June 28?

2          MR. KATAEV:  Your Honor, plaintiff is ready to proceed

3   with today's conference and the trial.  We are on track to

4   submit the remaining pretrial submissions due this Thursday,

5   June 10.

6          There is an issue about the pretrial submissions that

7   we need to discuss today, and I am also prepared, your Honor,

8   to discuss the effect of the Supreme Court's decision in *Van*

9   *Buren* on this case.  I believe that having this discussion

10  today will leave the Court with the firm conviction that

11  plaintiff is prepared to proceed and is ready.  Apart from us

12  not finishing on Monday and requiring a second day, I don't see

13  any other issues in terms of moving forward with the trial.

14         THE COURT:  Mr. Ranni, I presume you don't know what

15  the reference to the Supreme Court's decision in *Van Buren* is,

16  or do you?

17         MR. RANNI:  I do not.  My question is, I haven't had a

18  bench trial in federal court.  My issues -- maybe it's just me

19  being wrong, for which I apologize.  I received plaintiff's

20  exhibits or designations.  It was my understanding that

21  plaintiff puts forth what they need to prove, what affidavits,

22  what information they are going to have in their case in chief.

23  Then I am able to properly look at the evidence, figure out

24  authentication, foundation and agree whether we have the

25  exhibits or not, and then I'm able to determine what is

1   necessary for my case in chief.  That is the way I understood

2   it.

3        Mr. Kataev instead believes that I have to put in my

4   case in chief simultaneous with what he's submitting.  It just

5   seems patently unfair and not appropriate due process because I

6   am going to guess this evidence.  I have been guessing at what

7   this case is about from the very beginning as far as what his

8   proof and evidence is.  I don't know what his proof or evidence

9   is.

10        THE COURT:  You didn't move for summary judgment.  I

11   suppose if your position is, there is not even or evidence in

12   the record, you could have asked for summary judgment.  But I

13   would have discouraged it, in any event.  It may be not worth

14   it.

15        Let me ask this.  Have there been any exchange of

16   trial testimony declarations, Mr. Kataev?

17        MR. KATAEV:  As of this date, no, your Honor.  But the

18   deadline to do so has been extended until June 10.

19        THE COURT:  I understand.

20        Tell me, Mr. Kataev, you have about five or six

21   witnesses listed.  Who do you anticipate calling as your

22   witnesses?

23        MR. KATAEV:  Plaintiffs anticipating calling on their

24   case in chief solely the following two witnesses:  Ted Bessen,

25   the dealer principal and owner of the dealership, and Paranjit

1    Kalra.  Plaintiff reserves the right to subpoena certain

2    individuals but at this point does not anticipate doing so.

3    The individuals that plaintiff would subpoena would be someone

4    from VWFS Protection Services, Inc.  It's an entity that we

5    subpoenaed concerning the incentive rewards at issue in this

6    case that are subject to the Computer Fraud and Abuse Act

7    claim.  We will be working to secure an affidavit from a

8    custodian for purposes of admissibility, and there may be a

9    need for a live witness for that, but we are still deciding

10   that.

11          THE COURT:  Mr. Ranni, who do you anticipate calling

12   as your witnesses?

13          MR. RANNI:  Well, once plaintiff finishes, likely

14   Mr. Demersky because if he is calling Ted Bessen and he calls

15   Ms. Kalra, that pretty much covers the case.

16          THE COURT:  Let me ask this.  Given the limited number

17   of witnesses testifying and where we are at this stage, I am

18   inclined, actually, to, and because you have not exchanged

19   trial declarations, to forego that process, which is my typical

20   process and, instead, just have direct testimony given live.

21          Any objection to that, Mr. Kataev?

22          MR. KATAEV:  No, your Honor.  Whatever the Court feels

23   is proper for the trial.  We are comfortable either way.

24          THE COURT:  Mr. Ranni, any objection?

25          MR. RANNI:  No objection.  Thank you.

1          THE COURT:  We will do that.  That will simplify

2    pretrial submissions.

3          Just to explain the process, I do in bench trials,

4    typically, rather than having counsel prepare a direct

5    testimony outline, and it's predictable what the witnesses

6    within each counsel's control would say, I'll have you submit

7    that in advance and just get to the heart of the matter through

8    cross-examination.  Again, where we are and the limited number

9    of witnesses, I am comfortable foregoing that process and we

10   will do it the old-fashioned way and just have direct testimony

11   elicited live.

12         That takes care of that.

13         Mr. Ranni, you are required to indicate what exhibits

14   you anticipate relying on for your case in chief.  I think in

15   the final pretrial order that you have proposed you have just

16   indicated you are going to use what plaintiff has identified.

17         Nothing beyond that, Mr. Ranni?

18         MR. RANNI:  No.  We have no records beyond that.  I do

19   have certain objections to evidence that plaintiff may seek to

20   submit, which is why I wanted to understand what they were

21   looking to submit because we really had a lot of paper

22   exchanged in this case, but very little of it relevant.  It's

23   not a heavy document case, and the defense really is just

24   demonstrating that plaintiffs' documents don't support what

25   they are contesting.  I do not expect anything different, but I

1  do expect that I'll have objections to theirs.

2          THE COURT:  If it's just relevance objections, we will

3  take those as they come during the course of the trial.

4          There is an *in limine* motion pending.  That's yours,

5  Mr. Kataev?

6          MR. KATAEV:  No, your Honor.  That's the defendant's

7  motion *in limine*.  I'm happy to describe the motion if it helps

8  the Court.

9          THE COURT:  Yes.  These are agreements, am I right?  I

10  forget the term used to describe them.

11          MR. KATAEV:  There are essentially two components to

12  defendant's motion *in limine*.  I'll start with the agreements

13  that you reference, your Honor.

14          The defendant moves *in limine* to preclude the addition

15  of maintenance contracts and that's distinguished, your Honor,

16  from warranties.  Both are in play in this case and both are

17  very separate for distinct reasons, which will be established

18  at trial.  But the defendant seeks to preclude the introduction

19  of those maintenance contracts, and plaintiff opposes that.

20          THE COURT:  Mr. Ranni, is that a relevance-based

21  objection or something else?

22          MR. RANNI:  No.  It's actually authentication

23  foundation because my client had nothing to do with those

24  contracts, didn't get those contracts, didn't approve what they

25  claim was approved by him in those contracts.  There is

1    actually no personal action or additions or comments by my

2    client in any of those contracts or warranties, and they are

3    both done at the same time in a package.  They are not separate

4    and different.  They were done by salespeople, approved by a

5    sales manager, not my client, who is a general manager.  He had

6    no direct involvement with it.  So it's a foundation

7    authentication objection.

8            THE COURT:  I'll take those up at trial.  I will deny

9    the *in limine* motions to the extent it's seeking resolution

10   pretrial.  But the objection is preserved and can be reraised

11   once I see how plaintiff attempts to authenticate and lay a

12   foundation for those documents.

13           Any questions with respect to that, Mr. Ranni?

14           MR. RANNI:  None, your Honor.

15           THE COURT:  Mr. Kataev.

16           MR. KATAEV:  Just confirming that you don't need to

17   hear argument on why the motion *in limine* should be denied?

18           THE COURT:  No.  I am denying it, as I said, for

19   pretrial purposes, but the objections may be raised at trial.

20           MR. KATAEV:  There is a second component to the motion

21   *in limine*.  I'll be happy to describe that to the Court.

22           THE COURT:  Mr. Ranni, is there any other basis that

23   you want to raise for the *in limine* motion?

24           MR. RANNI:  I know my objections *in limine*, they were

25   exchanged.  I didn't have an opportunity to look at them.  If I

1    get an opportunity, I promise the Court and counsel that I will

2    fairly and objectively review any documents and try to avoid

3    any unnecessary objections.

4              THE COURT:  Thank you.

5              I think, Mr. Kataev, you indicated in your motion that

6    you did send those over to defense counsel, correct?

7              MR. KATAEV:  That's correct, your Honor.

8              Just to be brief about it, the maintenance contracts

9    are inside deal jackets, which contain very voluminous amounts

10   of papers concerning the sale of a vehicle or release of a

11   vehicle.  A lot of the documents within the deal jacket are

12   irrelevant.  We went through the painstaking process of culling

13   only what was relevant, scanning and submitting it to the other

14   side.  It's about 600 pages of documents for about 50 deals,

15   and we maintained in our office the original deal jackets with

16   all papers inside, relevant and irrelevant, and have made them

17   available for copying and inspection by the defendant.

18             We have also offered a deposition to the defendant of

19   a 30(b)(6) witness of plaintiff to ask any questions about the

20   maintenance contract so that we can avoid any arguments about

21   the prejudice of a late production on June 4.

22             MR. RANNI:  That's what that was.  Yes.  After all

23   this time, they then transferred documents, hundreds of pages

24   of documents that should have been exchanged a year and a half

25   ago, and I guess right before, as part of the pretrial order,

1   and they at the point to use that.

2          Even the objections in court, if the Court recalls the

3   discovery fights that we had in this and the production of

4   records and that the defendant was chasing the records, chasing

5   these records included, because we had always said that he had

6   no involvement in these records.

7          Now we get the complete maintenance agreements, which

8   I assume will demonstrate that he had no involvement.  I may

9   not have an objection.  I'll try to work with it.  But the late

10  production, a year and a half, of an important issue and it is

11  being exchanged, as a well as a pretrial order.

12         What frustrated me was that, I was looking for the

13  extensions for reasonable, I thought reasonable -- I understand

14  why it was denied.  But the plaintiff was objecting to those

15  extensions and here we are, after those -- at the very last

16  minute now they are exchanging all the documents.  That's

17  sandbagging and it's not fair.  It's prejudicial.  That's my

18  objection.  There was a motion *in limine* for that.

19         THE COURT:  Not, as you said a moment ago, just

20  authentication and foundation.

21         MR. RANNI:  And also the untimeliness of it, your

22  Honor, as far as the prejudicial nature.

23         THE COURT:  There is a lot of untimeliness going both

24  ways.  I can only cross the bridges that are in front of me.

25         MR. RANNI:  I'll retain the right to object as to

1   authentication and foundation.

2          After Wednesday, when I finally return to my life, I

3   promise I will review the documents and make my best effort in

4   a professional, courteous manner.

5          THE COURT:  Just looking at the calendar, if you are

6   going to continue your objection based on an untimeliness, I'll

7   order that I hear from you on or before June 14, which is next

8   Monday.

9          MR. RANNI:  That would be fine, your Honor.  Thank

10  you.

11         THE COURT:  You'll do your best to avoid unnecessary

12  objections.  I appreciate that.

13         While I have you, Mr. Kataev, why weren't these

14  produced until after the close of discovery?

15         MR. KATAEV:  Your Honor, very simple.  There is no

16  order compelling us to produce this discovery.

17         THE COURT:  My apologies.  Was it requested as part of

18  discovery and then no motion to compel was filed?  Is that what

19  you are saying?

20         MR. KATAEV:  As far as I understand, your Honor, in

21  reviewing the plaintiff's responses to defendant's discovery

22  demands, all of the deal jackets were requested with all the

23  documents inside.  The plaintiff objected based on overbreadth

24  and burden and, notwithstanding those objections, agreed to

25  provide a sampling of some of the deal jackets in order to

1    prove that these contracts were not booked into the deal as a

2    cost.

3        I don't recall whether this was done, but I do recall

4    that at the deposition, when reviewing this discovery, the

5    deposition with the plaintiff, the defendant's counsel demanded

6    production of all the maintenance contracts.  I responded that

7    I would like for the defendant to follow up in writing.  The

8    defendant never did so.

9        As far as I'm concerned, as far as the plaintiff is

10   concerned, there was no order, there was no real valid request,

11   at least one that was followed up on, and, therefore, there was

12   no obligation to produce everything.

13       However, as a matter of good faith in advance of the

14   trial, which has been produced practically a month in advance,

15   we have provided the defendant with scanned copies with either

16   originals available for copying and inspection.  It's just one

17   bankers box full of maintenance contracts.  It's not very

18   voluminous.  We have also offered the deposition.

19       In that regard, despite the fact that plaintiff

20   maintains there is no prejudice to defendant, to the extent

21   there is any prejudice, all of that has been sort of mitigated

22   by plaintiff's conduct in allowing defendant to understand the

23   documents.

24       THE COURT:  Mr. Ranni, just a moment.

25       Mr. Kataev, did you include the documents as a part of

1    your initial disclosures under Rule 26?

2            MR. KATAEV:  Your Honor, I did look at the initial

3    disclosures.  And I guess in my desire to be overly broad, I

4    did not really specify in much detail the word maintenance

5    contracts where deal jackets do not appear in the disclosures,

6    but I would argue that the way those disclosures are worded, it

7    does permit me to produce these documents.

8            THE COURT:  That sounds like it may be an issue.  I'll

9    ask counsel to do their best to work it out.  If these are

10   relevant documents and the defense not prejudiced, I would like

11   to figure out a way to move forward, but there may be issues.

12           Mr. Ranni.

13           MR. RANNI:  If I could make one quick point.  They

14   didn't produce them because they objected that it was

15   overbroad.  During the deposition we are talking about, the

16   primary issue concerning these warranties and maintenance, we

17   don't disagree that they were given on those deals.  This was a

18   typical thing that was given on many deals, but none of it was

19   ever decision making of my client.

20           That's why I wanted the documents way back when,

21   because they are voluminous, and I can go through it and

22   demonstrate that my client's fingers aren't in any of it.

23           But now, you know, this is sandbagging.  I get it

24   shortly before.  It's hundreds of pages.  But I will go through

25   it and I will try to work through it professionally,

1   cooperatively, and minimize objections, but be that as it may.

2         THE COURT:  I'll hear from you, please, by June 14 if

3   there is a continuing objection.

4         Mr. Kataev, to the extent that the dispute is whether

5   Mr. Demersky had specific involvement in these documents, if

6   that's uncontested, you can work out a stipulation to that

7   effect.

8         MR. KATAEV:  Your Honor, it's a tough thing to work

9   out.  A general manager is considered the top dog in the

10  dealership.  Everything goes through the general manager.  It's

11  his responsibility to oversee the operations of the dealership.

12  That's not in dispute, your Honor.  He admits that at his

13  deposition.

14        For him to absolve himself of any responsibility of

15  what's inside a deal jacket because he relied on a sales

16  manager is dereliction of his duties.  He has to make sure the

17  sales managers and the salespeople are doing the right things.

18        He sent documents at the beginning of his employment

19  concerning what's inside the deal jacket and how to properly

20  record everything in the deal.  We are holding him to that

21  responsibility, both what's in the policies that he signed and

22  just as a general common-sense nature of his duties.  He has to

23  make sure that everything is done properly.  He is allowed to

24  delegate his duties, but he is not allowed to absolve himself

25  of his duties.  Again, it sounds like there might not actually

1    be a factual dispute as to what occurred, but what arguments

2    you want to make from his responsibilities and the like.

3          MR. RANNI:  This court case is not about whether Phil

4    Demersky did a good job or bad job.  He wasn't fired.  He

5    voluntarily left.  Then this came after.

6          The claims that they are bringing, they have to show

7    intentional acts and that he defrauded and all these types of

8    things, not that he just did a bad job.  He is asserting in

9    federal court whether he did a good job or a bad job, but that

10   is not the claim.  The federal claim is that he misused the

11   computer and the computer system and that he misused or changed

12   the passwords, which they never produced during the course of

13   discovery or even now.

14         That is why this Court has jurisdiction.  That's the

15   claim that they have to prove, not that he's a bad employee,

16   which, if they were going to bring that, they should have

17   brought it in New York Supreme, not federal court.

18         THE COURT:  I can assure you I am only going to apply

19   the law.  If there is subject matter jurisdiction here, as a

20   result of the computer fraud, the CFAA statutory provision,

21   then the state law claims, of course, are here as a matter of

22   supplemental jurisdiction.

23         When you pay attention to the order I put out last

24   Friday, Mr. Ranni, the second order I put out noted that the

25   day earlier the Supreme Court issued an opinion on the meaning

1   of exceeding authorization under the CFAA.  It arguably

2   narrowed the interpretation, and some of the cases that Mr.

3   Kataev cites in his pretrial memorandum are cases that ended up

4   on the wrong side of that circuit split.  I don't know

5   factually what is in issue here, but certainly it raised the

6   question in my mind as to whether this federal claim has a

7   basis for proceeding.

8           MR. RANNI:  If there is a change of law, then maybe it

9   would be appropriate for a motion and for us to bring up that

10  particular issue.  I'm sorry to be ignorant and I'm sorry not

11  to have read your order, your Honor.  I'm truly sorry.  But

12  maybe that would obviate the need for a trial.

13          THE COURT:  Mr. Kataev.

14          MR. KATAEV:  Your Honor, I'd like to have a discussion

15  on procedural grounds and then substantive grounds.

16          THE COURT:  Sure.

17          MR. KATAEV:  Procedurally speaking, as far as I'm

18  concerned, when Mr. Ranni became an attorney admitted to the

19  Southern District of New York and got signed up with that

20  electronic case filing system, there is an absolute obligation

21  for him to review everything that comes in.  As far as I know,

22  your Honor, ECF bounces, and orders that come through go

23  directly to his e-mail, so the e-mail is successful on his

24  phone.

25          MR. RANNI:  I have that.

1          THE COURT:  Mr. Ranni, you may not interrupt.  You'll

2    have to wait.  I will make sure everybody gets a turn, but no

3    one may interrupt.

4          MR. RANNI:  My apologies.

5          MR. KATAEV:  As far as I'm concerned, your Honor, even

6    if Mr. Ranni was tied up from 8 to 6 on Friday and then the

7    same times Saturday and Sunday, he had the opportunity to

8    review his e-mails on Friday evening, and he could have given

9    the courtesy to this Court and to me, who went through

10   painstaking efforts to get here on time -- if I recount that,

11   that would be a very interesting story -- to at least advise

12   the Court that he is unable to make it today.

13         I would like for an order to be issued that Mr. Ranni

14   has an independent obligation to ensure that he reviews all

15   orders that come in and not delegate that responsibility to

16   support staff.  It's funny.  The defense counsel is like the

17   defendant here in absolving themselves of responsibility based

18   on their support staff's obligations.

19         THE COURT:  You heard where I started --

20         Mr. Ranni, I'm speaking.

21         MR. RANNI:  I'm sorry, your Honor.

22         THE COURT:  You heard where I started this conference,

23   which was trying to figure out why Mr. Ranni wasn't here, as I

24   had ordered.  We went through that.  I am allowing him to

25   proceed by phone, so we are here by phone.  What I said I would

1   hear today is on the issue of the impact, potential impact of

2   *Van Buren*.

3          Mr. Kataev, I gather you are prepared to make

4   presentation.

5          MR. KATAEV:  Yes, your Honor.

6          THE COURT:  In a moment I'll give you an opportunity

7   to do that.

8          Mr. Ranni, is there something you need to say before I

9   give Mr. Kataev that opportunity?

10          MR. RANNI:  No, your Honor.

11          THE COURT:  Thank you.

12          Go ahead, Mr. Kataev.

13          MR. KATAEV:  OK, your Honor.

14          Last Thursday the Supreme Court of the United States

15   decided the case *United States v. Van Buren*.  In that case a

16   police sergeant working for a police department, who did have

17   authorization to use his computer issued by the police

18   department, which there is no dispute over, and who did have

19   authorization to use the computer program to run license plate

20   searches, which there is no dispute over, and who did that use

21   that access improperly, was found to have not violated the

22   Computer Fraud and Abuse Act because he had authorization to

23   use the computer, and he had authorization to use the program

24   within the computer.

25          THE COURT:  Then he used it for improper purposes and

1   that's what the Court said was not within the meaning of the

2   statutory provision?

3         MR. KATAEV:  That's exactly correct.  It was a

4   violation of the police department's policy, but the Court

5   found that it was not a violation of the Computer Fraud and

6   Abuse Act.

7         This case is markedly different for several reasons.

8   As an initial matter, this Court still has subject matter

9   jurisdiction because there is a federal question right now as

10  to whether the defendant violated the Computer Fraud and Abuse

11  Act.

12        It's too late to file a motion under Rule 12(c)

13  because it would delay a trial.  If the defendant wanted to

14  move, I would only ask that the trial proceed and that the

15  decision on the motion be held in abeyance.  And this Court

16  already ruled in its decision dismissing the counterclaim that

17  it's too late to file a motion for summary judgment, which

18  defendant undertook no steps to take.

19        Going to the merits of the case here, this case is not

20  like *Van Buren*.  It's more like *Nixon*.  What happened here is

21  that we don't know whether the defendant had authorization to

22  use the computer because he denies ever accessing the system at

23  issue here.  If he used the dealership's computer while he was

24  employed, then he had authorization.  We allege in the

25  complaint that he accessed it after his employment, in which

1    case he would not have authorization.

2            Moreover --

3            THE COURT:  Let me just pause to make sure I

4    understand.

5            To prove your claim under CFAA you will put in

6    evidence that his unauthorized access of your client's computer

7    occurred after he left his employment and, therefore, had no

8    authorization to access.

9            MR. KATAEV:  We will argue that by inference from the

10   evidence that we do have.  We do not have conclusive evidence

11   that he actually did so, but we will argue by inference from

12   the evidence that we do have so that he did so after the fact.

13           THE COURT:  Give me a proffer as to that evidence.

14           MR. KATAEV:  Mr. Demersky resigned on or about July 23

15   of 2018.  The evidence that we will present will show that

16   after his resignation he received a payment in August of 2018

17   and September of 2018 for monies that were supposed to go to

18   the finance and insurance, what we call F&I in the dealership

19   realm.  So the F&I manager, those incentive rewards which were

20   paid directly from Volkswagen were historically and always paid

21   to the F&I manager.

22           In order for that to happen, the dealership had to

23   sign a special agreement to allow the F&I manager to receive

24   those payments because, as a matter of right and as a matter of

25   contract, those monies are the dealership's monies, not the

employee's monies.  So the dealership, as a matter of good

faith to its employees for selling warranties, which are

distinguished from maintenance contracts, for selling

warranties, allowed Volkswagen's incentive payments to go

directly to the person who is in charge of selling them.

        Mr. Demersky is a general manager.  He doesn't sell

warranties.  He was never entitled to receive this.  Even more

importantly, he admits at his deposition that he was never

entitled to receive any of these monies.  And he admits at his

deposition that the only way to receive those monies was on

authorization of ownership.  He does not claim, like Van Buren

can in his case, that he has the authority to enter this

system, to change anything in the system.

        THE COURT:  I don't understand what that has to do

with the timing issue.  Your paragraph topic sentence was --

        MR. KATAEV:  I veered off field.

        THE COURT:  Which suggests a weakness in the argument,

to be honest.  If the conclusion doesn't match up with the

topic sentence, there is something wrong in between the two.

        You started by saying that you were going to prove

lack of authorization, which I think is your obligation to

establish by a preponderance of the evidence from the inference

that payments were made in August and September and he resigned

in July.  Is that right?

        MR. KATAEV:  That's correct.  But even if we don't

1   prove that, we still prevail under the Computer Fraud and Abuse

2   Act claim.  Here is why.  Even if Demersky accessed the

3   computer he was authorized to access, if he gets on the stand

4   and we are unable to rebut that he used the dealership computer

5   and he did it during his employment and he made this change,

6   the fact of the matter is that the system that he accessed were

7   business computers.  He was never authorized to access this.

8   He admits at his deposition he was never authorized to access

9   it.

10          THE COURT:  The it is like an application that you

11   click on and you go in and enter information?

12          MR. KATAEV:  That's correct, your Honor.  I'm glad you

13   brought that up.  There are three systems.  They are all web

14   based, and they all require a user name and password to enter

15   them, much like you would use for Gmail or for ECF.

16          One of the systems is called VW Hub.  That's for

17   maintenance contracts.  Demersky admits at his deposition that

18   he did have access to enter that system.

19          THE COURT:  He had a user name and password?

20          MR. KATAEV:  That's correct.

21          Another system is called Volkswagen Direct.  I think

22   that has to do with sales, I'm not sure, but that's not an

23   issue here.  He did say that he has access to that system.

24          The third and final one is the Volkswagen Drive Easy

25   Portal, which also requires a user name and password in which

1    Demersky states at his deposition unequivocally, I never had a

2    user name and password, I didn't have any authority to enter

3    that system, and I never did enter that system.  Yet, we have

4    evidence that the defendant received over $5,000 in

5    compensation from January of '18 through September of 18.

6              THE COURT:  His factual claim is that he didn't enter

7    it.

8              MR. KATAEV:  I refer to his defense as the Shaggy

9    defense, your Honor.  It wasn't me.  I didn't do it.

10             THE COURT:  My nomenclature is that factually he is

11   asserting he didn't enter it.  That's not enough.  You need me

12   to disbelieve that in order for you to prevail.

13             MR. KATAEV:  That's correct.

14             THE COURT:  That leaves the question of whether he was

15   authorized to access it, and you've got to prove to me, and

16   it's like a proffer, other than his testimony that you want me

17   to discredit, what you will point to to show that he was not

18   authorized to access that.

19             MR. KATAEV:  Your Honor, there is one thing that we do

20   agree with on both sides is that Demersky does not have

21   authorization to enter the Volkswagen Drive Easy system.  He

22   admits that.

23             THE COURT:  You want me to rely on his testimony as to

24   that.

25             MR. KATAEV:  No, your Honor.  We have documentary

1    evidence of that as well.  That's all in the discovery that we

2    submitted to the defendant, not the new discovery with the

3    maintenance contract.

4           THE COURT:  I'm just asking for a proffer.  At the end

5    of the day you'll put it in and you'll say, Judge, for the

6    element where we have to prove that he wasn't authorized, here

7    are the documents or the testimony you should look at.  What

8    will that be?

9           MR. KATAEV:  It will be the contract between the

10   dealer and VWFS Protection Services, Inc., which explicitly

11   states that it's the dealership's money unless they enter into

12   a dealership override agreement and it will be the testimony as

13   well.  And there are also some e-mails exchanged that make it

14   clear that what Demersky did, he knew what he was doing, and he

15   did it on purpose in order to obtain these monies.

16          THE COURT:  I will just tell you my gut.  I'll see how

17   it comes in.  But my gut reaction is, that's not going to be

18   enough to show that he didn't have authorization to enter that

19   portal.  It existed on his computer, I assume.  He is the

20   general manager.  I don't know if he had any responsibilities

21   that would ever require him going in there, even if it were to

22   review what others did and the like.  But you are going to have

23   to show, I think, relying on testimony other than his, which

24   you are asking me not to credit, that he was unauthorized to

25   access that portal.

 1             MR. KATAEV:  Allow me to sweeten the pot further, your

 2    Honor.  Demersky states at his deposition that prior to working

 3    at Teddy Volkswagen, he worked for another Volkswagen

 4    dealership.  At that dealership he was aware of the incentive

 5    program and had a special debit card in which Volkswagen placed

 6    this incentive money on.  The way the incentive money is

 7    received is on a prepaid debit card.  He claims at his

 8    deposition that to the extent he received any money from any

 9    incentive program, that's where it went, and he specifically

10    denies receiving any money from the Drive Easy F&I rewards

11    program.  Our documentary evidence shows conclusively that he

12    did receive.

13             THE COURT:  If the Supreme Court had come out the

14    other way, all of that would be highly relevant, I think, to

15    the question of whether he was violating policy in exceeding

16    his access to something that he was able to access.  The

17    Supreme Court in cases you cited are no longer good law.  The

18    Supreme Court came out the other way.  It doesn't mean you

19    can't make out your claim.

20             But I'm asking what your proffering evidence is as to

21    the notion that in his job, as general manager, on that

22    computer where that portal existed, that he was not authorized

23    to access it.

24             What I hear you saying is, he testified that he never

25    did.  He testified that he never had a user name and password.

1   He did have access to it in his prior job at Volkswagen, but he

2   is denying that he did now.  I sit here fully with an open

3   mind, but you are circling around, I think, the key issue.

4        MR. KATAEV:  I am going to fine-tune it because I

5   think it's important for the Court to understand.

6        THE COURT:  Sure.

7        MR. KATAEV:  In order for him to have authorization,

8   he has to have a user name and password.  The lack of a user

9   name and password that was granted by the dealership to

10  Demersky means that he did not have authorization to enter that

11  system.

12       THE COURT:  Without a user name and password you can't

13  enter the system?

14       MR. KATAEV:  That's correct.

15       THE COURT:  Did he have a user name and password?

16       MR. KATAEV:  He alleges -- withdrawn.  He avers in his

17  deposition that he never accessed it and did not have access to

18  it.

19       THE COURT:  But you contest -- you are going to put on

20  evidence that he did, right?

21       MR. KATAEV:  I am going to put on evidence that he

22  improperly accessed it, that's correct.

23       THE COURT:  How did he do that?  What does the

24  evidence show as to how he did that?

25       MR. KATAEV:  The evidence shows that Mr. Demersky,

1    without informing anybody else at the dealership and without

2    receiving permission, reached out directly to Volkswagen,

3    contacted Volkswagen in order to set himself up with access and

4    unilaterally change things that he admits he did not have

5    authorization to do.  Therefore, the second prong of the CFAA

6    is met.

7          The first prong is, he didn't have authorization to

8    use the computer.  So that's a live issue as far as I'm

9    concerned, depending --

10          THE COURT:  That's the timing issue.

11          MR. KATAEV:  Correct.

12          THE COURT:  If he's accessing --

13          MR. KATAEV:  That's correct.

14          THE COURT:  You want me to infer that he had no

15    authorization since the inference is he's accessing after he

16    has left --

17          MR. KATAEV:  Exactly.

18          The second issue is, even if he did have access to

19    this computer and had authorization to use that computer, he

20    did not have authorization to enter that Drive Easy Portal.

21          Therefore, this case is different from *Van Buren*

22    because in *Van Buren* the defendant there had access to both the

23    computer and access to the underlying system, whereas here,

24    even if he did have access to the computer, which is still a

25    live issue, he admits, and there is no dispute whatsoever, that

1    he did not have access, that he wasn't authorized to access the

2    underlying system.

3            THE COURT:  Go ahead, Mr. Ranni.

4            MR. RANNI:  Judge, authorization was given by the

5    employer.  The Drive Easy program is one where you have access

6    to look at information, but no access to change it.  The Drive

7    Easy and the direction of the money was by Teddy Volkswagen.

8    He had access to see information.  He had no access to

9    determine where money went, how it went, who would otherwise

10   get it, number one.

11           The timing issue.  It's undisputed evidence.  They

12   locked him out of this system when he left.  The money he got

13   paid was for work previously performed, before he got fired.

14   There was no subsequent access.  To whatever extent he got

15   paid, that was determined by the employer.  He had no

16   involvement.  And that's just it.

17           Under *Van Buren*, it's right on point, except that he

18   never exceeded even his authority.  So he has a computer.  He

19   has the access.  They provided it.  He acted in accordance with

20   the access he had and that's that.  He never went in with

21   Volkswagen and changed the access or password.  He wouldn't

22   have authorization to make those changes and never did.  Never

23   did.

24           THE COURT:  I understand.

25           MR. RANNI:  The money he got was clearly paid for work

1   performed before because Ms. Kalra got the money after.

2          THE COURT:  I understand.  We are not going to resolve

3   this now.  There are factual disputes here.  I think *Van Buren*

4   may very well change the calculus as to the second prong.

5   Again, it doesn't mean you can't meet it.  If your briefing

6   relies on cases that are now no longer good law, it's a sign.

7   It's a factual dispute as to whether or not he had

8   authorization.

9          I'll note Mr. Kataev's intention.  You want to rely on

10  his testimony to say he didn't have access to it, but rely on

11  that same testimony to say that he's lying about the fact --

12  you want me to discount it to say that he did not access it.

13  It's an issue.  You obviously have looked at it.  It sounds

14  like it's what will be argued once the facts are in evidence.

15         MR. RANNI:  If I may, your Honor.

16         THE COURT:  Go ahead.

17         MR. RANNI:  I think the Court's question on the

18  proffer was extremely prescient.  What evidence do they have to

19  shows that he went in, Phil Demersky went in and altered a

20  password or access so he could receive money.  What is that

21  evidence?  Because that's what their claim entirely is lynched

22  to.  That they don't have, never had it, never produced it, and

23  they don't have it now.  It doesn't exist.

24         I think a motion on *Van Buren* would be appropriate

25  because I think it would demonstrate that plaintiff has no

1   *prima facie* claim anymore and the change in the law, I think,

2   permits the variation on procedure to allow a motion at this

3   point because it can obviate the trial because it's a primary

4   issue in the trial.

5           MR. KATAEV:  I have a response to that.

6           THE COURT:  Go ahead.

7           MR. KATAEV:  I don't disagree that briefing is crucial

8   in this case, but I don't agree that it requires a postponement

9   of the trial.  I respectfully submit the trial should move

10  forward and that upon completion of the trial the Court allow

11  the parties to submit posttrial briefs, specifically posttrial

12  proposed findings of fact and conclusions of law to aid this

13  Court in making a determination on the merits.

14          I just have one final point on the viability of the

15  Computer Fraud and Abuse Act claim.  Even if the Computer Fraud

16  and Abuse Act claim goes, I respectfully submit that at this

17  point this Court should exercise its discretion in favor of

18  retaining supplemental jurisdiction because we are already at

19  trial and the only thing that will result in dismissing the

20  Computer Fraud and Abuse Act claim and remanding the remaining

21  state law claims is for this case to languish in state court

22  when it is ready for trial on a full decision on the merits and

23  for the plaintiff to receive the day in court.

24          Your Honor, the old adage is justice delayed is

25  justice denied.  I don't believe that at this point any further

1   continuance or adjournment of the trial is necessary.  This

2   case needs to be decided, and we are prepared to move forward.

3          MR. RANNI:  Your Honor, the Court's time and the

4   litigants' time.  I represent an individual.  He doesn't have

5   deep pockets.  On an issue of law that is critical on evidence

6   that plaintiff would necessarily have to produce or would

7   necessarily be of a documentary nature, to go forward with a

8   trial and waste the Court's time and resources and seek factual

9   testimony, I think it's just a waste of judicial economy,

10  especially when the key issue is a piece of evidence that

11  plaintiff necessarily must have now and could be resolved with

12  simple motions.

13         This has been nothing but intense burden and cost and

14  the misuse of the federal court jurisdiction for a claim that

15  never existed to begin with, *Van Buren* or not.  Whether it

16  languished in state court, that's where this case should have

17  been brought, but it never would have been brought because

18  there is no basis to state a claim anyway.

19         Defendant does want the plaintiff to be sanctioned

20  because there is no evidence or it will be shown that there was

21  no evidence and that can be demonstrated through a simple

22  motion.

23         THE COURT:  Mr. Ranni, I am not going to sanction.

24  You could have sought to bring a summary judgment motion if

25  your argument is *Van Buren* or not.  You were untimely in that,

1    which is why I didn't allow it.  I do also generally discourage

2    it for bench trials because it's just doing the same thing

3    twice.

4              That said, we have an unusual situation here, which is

5    the Supreme Court just this week issued a decision directly on

6    point to the federal claim.

7              Mr. Kataev is right.  Certainly if we proceed to

8    trial, even if the federal claim is out, I can't imagine I

9    wouldn't exercise my discretion to resolve the state claims.

10             Pretrial it's a different posture, so that's why the

11   decision whether to allow briefing at this point is an

12   important one.  I am going to think about that.  Here is what

13   we are going to do.

14             Mr. Ranni, you are going to put in a letter by Monday

15   indicating whether you are going to maintain that objection to

16   the maintenance contracts and warranties based on the failure

17   to produce them prior to June 4 and during the discovery.  Mr.

18   Kataev's argument is, you didn't ask for them, so he wasn't

19   required to turn them over.

20             Mr. Kataev, I am going to ask you to put in a letter

21   with a factual proffer by Monday that details what evidence,

22   both documentary and testimonial evidence, you believe will

23   develop at trial from which your CFAA claim could prevail.

24             MR. KATAEV:  Your Honor, if I may, I'd like to request

25   that in lieu of a letter I just submit a revised proposed

1   findings of fact and conclusions of law.  Your rules require

2   that the evidence supporting each proposed finding of fact be

3   there.  Currently the one that we submitted does not have that.

4   I intended to supplement it.  In lieu of a letter, may I do

5   that?

6          THE COURT:  Yes, you may do that.  Obviously, I am not

7   asking for trial declarations, so you can't cite to those.  You

8   can cite to deposition testimony.

9          MR. KATAEV:  That's all I need, your Honor.

10          THE COURT:  I'll see that by Monday as well, and then

11   I'll let you know at that point -- I suppose, Mr. Ranni, I'll

12   give you -- I think what I'll do is, I'll just look at that and

13   decide, based on it, whether I want to proceed to trial or

14   postpone trial and order briefing on the impact of *Van Buren*.

15          Any objection, Mr. Ranni?

16          MR. RANNI:  None.

17          THE COURT:  Mr. Kataev.

18          MR. KATAEV:  No objection, your Honor.

19          THE COURT:  I think that is what we need to resolve

20   today.

21          It's a bench trial, so I can't involve myself in

22   settlement discussions.  You will let me know if you would like

23   to return to the magistrate judge for that effort.  I certainly

24   think that it's worth having a discussion with each other and

25   see if there is any possibility of saving the resources and

1    moving them rationally towards some resolution of the case.

2    That's my only input on that.  You let me know if you would

3    like to go back to the magistrate judge or if there is anything

4    else the Court can do to be of assistance.  OK, Mr. Kataev?

5          MR. KATAEV:  Yes, your Honor.  For the record,

6    plaintiff is always prepared to discuss settlement.  We have

7    indicated what the settlement negotiation has been in letters

8    to the Court, so I won't belabor them here.

9          MR. RANNI:  That's not true.

10          MR. KATAEV:  If defendant is agreeable, we will appear

11   before Magistrate Judge Netburn and discuss settlement.

12          MR. RANNI:  The plaintiff put a precondition to

13   settlement discussion.  That's not always available for

14   discussion.  There were preconditions.

15          THE COURT:  Mr. Ranni, are you open to going back to

16   Judge Netburn for a discussion, given where we are?

17          MR. RANNI:  I would, your Honor, but without

18   preconditions.

19          THE COURT:  Mr. Kataev.

20          MR. KATAEV:  I am not sure what he means by

21   preconditions.  But if he is willing to discuss settlement, we

22   will move and discuss settlement.

23          THE COURT:  I think the referral is still out.  If

24   it's not, I will reopen the referral.  I will let Judge Netburn

25   know that you'll be in touch to see about whether a quick

1  phone -- she can't get you in person, but let's just try to do

2  it in the next couple of days, if she is available.

3        OK, Mr. Ranni?

4        MR. RANNI:  Yes, your Honor.  That's fine.

5        THE COURT:  I appreciate your efforts there.

6  Obviously, if resources can be more rationally allocated to a

7  settlement rather than trial, that's great.  If not, we will

8  get to trial as soon as we can after I have considered whether

9  there should be some briefing on the impact of the Supreme

10  Court's decision last week in *Van Buren*.

11        Mr. Kataev, is there anything else I can address?

12        MR. KATAEV:  No, your Honor.  I want to thank you for

13  the inordinate amount of time you gave to this case today.

14        THE COURT:  Of course.

15        Mr. Ranni, anything else?

16        MR. RANNI:  No.  And thank you very much to the Court

17  for your courtesies, and my apologies.

18        THE COURT:  Thank you, counsel.  We are adjourned.

19        (Adjourned)

20

21

22

23

24

25